**People of the State of Illinois, Appellee, v. Peter Ross, Appellant.**

**Gen. No. 51,997.**

First District, Fourth Division.

December 18, 1968.

Rehearing denied January 23, 1969.

Gerald W. Getty, Public Defender of Cook County, of Chicago (Herbert Becker, Norman W. Fishman, and James J. Doherty, Assistant Public Defenders, of counsel), for appellant.

John J. Stamos, State's Attorney of Cook County, of Chicago (Elmer C. Kissane and Robert B. Rosen, Assistant State's Attorneys, of counsel), for appellee.

MR. JUSTICE DRUCKER delivered the opinion of the court.

This is an appeal from a judgment in a bench trial finding defendant guilty of voluntary manslaughter of his wife, Mary Ann Ross, and of attempt to commit the murder of Martin O'Donnell. Defendant was sentenced to concurrent terms of not less than two nor more than fourteen years in the Illinois State Penitentiary.

CONTENTIONS ON APPEAL

1. Defendant was not proven guilty beyond a reasonable doubt.

2. The judgments on the two indictments were inconsistent and must be reversed.

EVIDENCE

*Testimony of Martin O'Donnell, for the State*

He is a pharmacist and part owner of Renneckars, Inc., a drugstore. Mary Ann Ross was working for him on June 9, 1965, and had been in his employ for about six months. On June 9, 1965, she worked a nine-to-six day; she returned to the store at about 9:30 that evening and then went to a tavern across the street. At about 11:00 o'clock he went to the tavern and saw her sitting with Walter Bauer and Bob Anderson. They all remained in the tavern for about another forty-five minutes at which point Mary Ann Ross asked if someone would follow her home, and he volunteered.

He had never been to Mary Ann Ross' home before and found it only by following her there. She arrived at home and parked her car in the rear of the apartment building, and he pulled his car in front of hers. She got out of her car and came over to the passenger side of his car. He is not sure if she got into the car. At that time defendant, Mary Ann Ross' husband, came up to the witness' car, grabbed Mary Ann Ross by the left hand and started to stab her. Defendant said something to the effect that so this is the guy, and Mary Ann said, "No, this is Marty."

He did not see a knife in defendant's hand immediately; he saw it only after defendant had hit Mary Ann several times. When he realized what was happening he tried to reach over and grab the knife. There were sample boxes in the middle of the front seat but he was able to reach over and take the knife from the defendant. Defendant had the knife in his right hand and tried to strike the witness as witness reached for it. Witness was hit with the knife on the right side of the chest. He was able to pull the knife from the de-

432

fendant's grasp by prying open his fingers. Witness then opened the car door and threw the knife across the road. Defendant struck Mary Ann at least three or four times.

After witness got rid of the knife he started to walk around the car, and defendant started to walk away very fast. A young man came up and helped lift Mary Ann into his car, and then drove her to the hospital.

*Testimony of Edward Cooper, for the State*

He is a soldier in the United States Army and lives at 1728 Greenwood Avenue in a rear corner apartment on the second floor. He returned home early in the morning of June 10, 1965, and was attracted to his window by the sound of a car door slamming outside. Looking out of his window he saw two people sitting in a car and also saw defendant creeping toward the car. Defendant came around the corner of the building, walked up to the car, jerked the door open, yelled something about his wife and lunged into the car. There was a scuffle in the car and then a man got out of the driver's side of the car and threw something across the street into the field. Defendant then got out of the passenger side of the car "dragging the woman and dropped her." As the woman lay on the ground, defendant walked away. After O'Donnell threw the object, "he said to call the police."

He did not see a knife nor did he ever see defendant strike a blow.

*Stipulation of Testimony of Dr. E. Tapia*

The parties stipulated that Dr. E. Tapia is a pathologist employed by the Coroner of Cook County and that if he were called as a witness he would testify that he conducted an internal and external examination on the body of Mary Ann Ross and that he would further testify that the cause of death of this person was a stab wound of the heart.

■■■■■■■

*Testimony of Wayne Kendall, for the State*

He is a detective on the Cook County Sheriff's Police. At about 1:15 a. m., in response to a call, he arrived at the rear of an apartment building in the 1700 block of Greenwood in an unincorporated area of Northfield Township. After speaking to Edward Cooper he searched the field just west of the apartment building. He found a knife in the field about twenty-five yards west of the driveway of the apartment building. He did not test the knife for fingerprints nor did anybody else because the handle of the knife was of a grained wood which, he was taught at the Police Academy, does not retain fingerprints; he did not check the blade because it was stuck into the ground with only one-half inch showing.

*Testimony of Peter Ross, defendant*

He is fifty-three years old, has never been before a judge except for traffic violations and has been in the dairy business for some thirty years as a driver. Mary Ann Ross, the deceased, was his second wife. They had been living separately since the previous May, when Mary Ann Ross moved to 1728 Greenwood with her three children by a previous marriage. He had seen her every day since the separation, save about three, and he frequently brought milk and water for her and the children.

He had lunch with his wife on June 9, 1965. He then went to his wife's home and stayed with the children until 5:00 p. m. before going to his home. His wife called him that evening and they made arrangements to go shopping the next day. At ten that evening he returned to his wife's apartment with some water, milk and a pie. She was not home when he arrived, so he waited for her, expecting that she would return momentarily. He did not go into the apartment at first because he expected her to return momentarily; he waited in his car. Later he went back upstairs but the

lights were out and he did not go in because he did not want to waken the children.

At about 1:05 a. m. he was sitting almost at the top of the stairs waiting. She drove up at that time and another car pulled in right behind her. She walked up to the other car and said: "I told you, hon, not tonight," and he said: "Oh, come on, get in here." He then walked toward the car and saw his wife and the other man in a huddle, making love. He watched for a minute and then opened the door on the passenger side and said: "Come on, this is my wife." She tried to kick him and said: "Marty, please, get him away from me." She kept kicking at him and hanging onto the other man.

As his wife was kicking at him, O'Donnell (the other man) picked himself up and had something in his hand. Defendant did not realize that it was a knife at first but grabbed O'Donnell's hand and pinned it to the steering wheel. Defendant was slipping on the asphalt but regained his balance and got into the car where he was able to brace himself against the door and shove O'Donnell's hand backward so that the knife went out of his hand off his left shoulder and out of the car some fifteen to twenty feet. Defendant realized that O'Donnell had a knife during the struggle. The knife did not belong to defendant and he had never seen it before the night his wife was killed. During the fight he received cuts on his hands requiring fourteen stitches to close.

After the knife was out of the car defendant asked his wife if she was hurt and she said no; she was swearing at him. He asked her to drive him to the hospital because his hands were bleeding and she refused. He pulled her away from O'Donnell towards the right side of the car; O'Donnell started to get out of the car at about this time. Defendant got out of the car and began to plead with his wife to either let him drive her to the hospital or for her to drive him there.

435

He decided not to go upstairs because he did not want to alarm the children. He finally turned back to his wife and asked her if she was coming and then said that he was going to have her declared an unfit mother. He then walked towards his car. About twenty feet away he turned back because his wife might have changed her mind but she was sitting in the car staring at him. He then drove to his home in Highland Park. At 5:00 a. m. he was taken to the hospital for treatment.

He did not see his wife or O'Donnell get stabbed. If either got hurt it was accidentally in the course of the struggle.

OPINION

Defendant first contends that he was not proven guilty beyond a reasonable doubt because the evidence of the prosecution is improbable, unconvincing and contrary to human experience (People v. Ware, 23 Ill2d 59, 62, 177 NE2d 362). He rests his argument on two basic facts: (a) the fact that O'Donnell threw the knife away; and (b) the fact that defendant received cuts on his hands requiring fourteen stitches.

Defendant argues that O'Donnell threw away valuable evidence when he threw the knife from the car and reasons that this is puzzling conduct at best but is generally the action of a guilty individual. We find the conduct of O'Donnell to be quite natural in the circumstances. Mary Ann Ross had already been seriously injured with the knife, and O'Donnell had been nicked close to the heart; it is highly reasonable action to put the dangerous instrument out of reach of the aggressor. Thus, once O'Donnell had taken the knife from the defendant the logical thing to do was to throw it completely out of his reach and prevent any further injury. O'Donnell said he *threw* the knife; Cooper saw him *throw* it; defendant testified that he shoved O'Donnell's

436

hand backwards "so the knife went out of his hand off his left shoulder" and that the knife went not more than fifteen or twenty feet. The police officer, minutes after the struggle, found the knife twenty-five yards away buried in the ground with one-half inch of the blade above the ground. The trier of fact could find that it was the defendant's evidence not the State's that was improbable.

Defendant also argues that since he received a fourteen-stitch cut while O'Donnell received only a slight nick, it shows that O'Donnell must have been wielding the knife in the first instance. This is not necessarily true. O'Donnell could well have received his cut when defendant lunged at him and defendant could have been cut when O'Donnell took the knife from him. Indeed, O'Donnell's testimony is consistent with just such an interpretation. O'Donnell testified that he grabbed the knife by the handle and ripped it out of defendant's grasp; in the process of so doing, with the defendant still trying to clutch the knife, defendant could easily have gotten his hand badly cut. Furthermore, Cooper testified that O'Donnell told him to call the police and that defendant drove away.

In determining the credibility of O'Donnell and defendant the court placed great reliance on the testimony of Cooper. Although he did not see the stabbings which occurred inside the automobile, Cooper's testimony sharply contradicts defendant's account of the incident. Defendant testified that he was sitting at the top of the stairs when the cars drove up; that he walked down a couple of steps and noticed that the occupants of the car were in a huddle; that he walked over to the car and watched them for about a minute and then opened the door. Cooper testified that he saw defendant "creeping around the corner of the building directly under my window . . . [h]e came around the corner and walked up to the car and jerked the door of the car open . . . ."

437

Next defendant testified that after the knife was out of the car he asked his wife if she was all right, that he asked her to drive him to the hospital, that she refused and swore at him, that as he was returning to his car he looked back and saw her sitting in O'Donnell's car staring at him. Cooper, however, testified that defendant dragged Mary Ann Ross out of the car and that she lay on the sidewalk as defendant walked away. O'Donnell also testified that when he got around the car Mary Ann Ross was lying on the ground.

The court could also find it unbelievable that an estranged husband who had lunch with his wife and who thereafter received a phone call from her "because we were supposed to go shopping again" waited in front of her apartment from 10:00 p. m. to 1:05 a. m., although he had seen her car parked in front of the drugstore. These actions were more consonant with jealousy than with shopping.

██ ██ In People v. Clemons, 26 Ill2d 481, 484, 187 NE2d 260, the court stated:

> [W]here a case is tried by the court without a jury, the determination of the credibility of the witnesses and the weight to be accorded their testimony is committed to the trial judge; and, unless it can be said that the court's judgment is found to rest on doubtful, improbable or unsatisfactory evidence, or clearly insufficient evidence, a reviewing court will not substitute its judgment for that of the court below even though evidence regarding material facts is conflicting and irreconcilable. (People v. West, 15 Ill2d 171.)

The record in this case compels agreement with the conclusion of the trial court that defendant was guilty of the voluntary manslaughter of his wife.

Defendant secondly contends that the judgments on the two charges are inconsistent and must be reversed

or in the alternative, that the conviction of attempted murder must be reversed. He argues that voluntary manslaughter is devoid of intent while attempted murder specifically requires intent; and since the voluntary manslaughter of his wife and the attempted murder of O'Donnell arose from the same acts committed at virtually the same time, there is a logical inconsistency between the judgments.

The definition of Voluntary Manslaughter in the Criminal Code, Ill Rev Stats, c 38, § 9–2, in pertinent part shows it to be a crime without any element of intent:

(a) A person who kills an individual without lawful justification if at the time of the killing he is acting under a sudden and intense passion resulting from serious provocation by:

(1) The individual killed, or
(2) Another whom the offender endeavors to kill, but he negligently or accidentally causes the death of the individual killed.

Serious provocation is conduct sufficient to excite an intense passion in a reasonable person.

The definition of Attempt, however, shows it to be a specific intent crime, Ill Rev Stats, c 38, § 8–4:

(a) Elements of the Offense.

A person commits an attempt when, *with intent to commit a specific offense,* he does any act which constitutes a substantial step toward the commission of that offense. (Emphasis added.)

■ The exclusion of an intent element from the definition of Voluntary Manslaughter and the specific inclusion of it in the definition of Attempt negates the possibility of the same acts supporting convictions for

439

both crimes. See People v. Weeks, 86 Ill App2d 480, 230 NE2d 12. However, the People contend that the stabbings of Mary Ann Ross and O'Donnell were separate acts; that there was a time interval between the voluntary manslaughter of Mary Ann Ross and the attempted murder of O'Donnell; and that during this interval the sudden and intense passion which led to the slaying of Mary Ann Ross ceased and the intent to kill O'Donnell was formed.

■ ■ In People v. Washington, 27 Ill2d 104, 109, 187 NE2d 739, the court in distinguishing voluntary manslaughter from murder stated:

> [F]or if there should appear to have been an interval between the assault or provocation given, and the killing, sufficient for the voice of reason and humanity to be heard, the killing shall be attributed to deliberate revenge, and punished as murder.

In the instant case the People's only witness to the actual stabbing, O'Donnell, testified:

> I did not immediately see a knife in defendant's hand. I saw one after he had hit the victim several times. I did not realize just what was happening and when I did I tried to reach over and grab the knife.
>
> . . . . . .
>
> After he hit her he tried to strike me while I was reaching for the knife and he hit me on the right breast.
>
> . . . . . .
>
> When the defendant reached, he grabbed her right hand with his left hand and started to pull her when I realized that he did have a knife. I reached over and tried to grab it from him.

440

From this evidence we cannot find that the People proved that there was sufficient time "for the voice of reason and humanity to be heard" nor that defendant was proven guilty beyond a reasonable doubt of a specific intent crime—attempt to commit murder. (People v. Coolidge, 26 Ill2d 533, 187 NE2d 694.) The conviction for attempt to commit murder is reversed.

The conviction of defendant for voluntary manslaughter is affirmed and the conviction for attempt to commit murder is reversed.

Affirmed in part, reversed in part.

McCORMICK, P. J. and ENGLISH, J., concur.